UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID WHITEASH, | ) | CIVIL ACTION NO. 4:20-CV-1523 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| Defendant | ) | |

<u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff David Whiteash, an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g).

This matter is before me, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, I find the Commissioner's final decision is not supported by substantial evidence. Accordingly, I conclude that the Commissioner's final decision should be VACATED.

Page 1 of 26

## II.    BACKGROUND & PROCEDURAL HISTORY

On May 15, 2018, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act. (Admin. Tr. 10; Doc. 18-2, p. 11).  In this application, Plaintiff alleged he became disabled on June 1, 2012, when he was thirty-nine years old, due to the following conditions: left eye—blind with pain; right eye loss of vision; right and left torn retina; diabetes; high cholesterol; and high blood pressure. (Admin. Tr. 134; Doc. 18-6, p. 3). Plaintiff later amended his onset date to June 8, 2017, when he was forty-four years old. (Admin. Tr. 10; Doc. 18-2, p. 10). Plaintiff alleges that the combination of these conditions affects his ability to lift, squat, bend, see, complete tasks, and concentrate. (Admin. Tr. 156; Doc. 1806, p. 25). Plaintiff has at least a high school education. (Admin. Tr. 15; Doc. 18-2, p. 16). Before the onset of his impairments, Plaintiff worked as an automobile service manager and slitter machine operator. (Admin. Tr. 15; Doc. 18-2, p. 16).

On October 3, 2018, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 10; Doc. 18-2, p. 11). On October 16, 2018, Plaintiff requested an administrative hearing. *Id*.

On May 23, 2019, Plaintiff, assisted by his counsel, appeared and testified during a hearing before Administrative Law Judge Michelle Wolfe (the "ALJ"). *Id*.

On August 8, 2019, the ALJ issued a decision denying Plaintiff's application for benefits. (Admin. Tr. 17; Doc. 18-2, p. 18). On October 11, 2019, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (Admin. Tr. 110; Doc. 18-4, p. 28).

On June 25, 2020, the Appeals Council denied Plaintiff's request for review. (Admin. Tr. 1; Doc. 18-2, p. 2).

On August 25, 2020, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the application is not supported by substantial evidence, and improperly applies the relevant law and regulations. *Id*. As relief, Plaintiff requests that the Court enter an order awarding benefits. *Id*.

On March 9, 2021, the Commissioner filed an Answer. (Doc. 17). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. *Id*. Along with her Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 18).

Plaintiff's Brief (Doc. 21) and the Commissioner's Brief (Doc. 22) have been filed. Plaintiff did not file a reply. This matter is now ripe for decision.

## III.   STANDARDS OF REVIEW

Before looking at the merits of this case, it is helpful to restate the legal principles governing Social Security Appeals.

### A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record,

Page 4 of 26

substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

**B.    STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).[1] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a). Under this

---

[1] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on August 8, 2019.

process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; *Mason*, 994 F.2d at 1064.  Once this burden has

been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 404.1512(b)(3); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

Having reviewed the applicable legal standards, I now turn to the merits of Plaintiff's claims.

## IV.   DISCUSSION

In his statement of errors, Plaintiff raises the following issue:

(1)   Is there substantial evidence to support the ALJ's decision that Plaintiff is not disabled based on the above-mentioned RFC?

(Doc. 21, p. 2).

### A.   THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In her August 2019 decision, the ALJ found that Plaintiff met the insured status requirement of Title II of the Social Security Act through December 31, 2017. (Admin. Tr. 12; Doc. 18-2, p. 13). Then, Plaintiff's application was evaluated at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between June 8, 2017 (Plaintiff's alleged onset date) and December 31, 2017 (Plaintiff's date last insured) ("the relevant period"). (Admin. Tr. 12; Doc. 18-2, p. 13).

At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments: status-post retinal detachment repair of left eye; retinal tear and macular hole; retinal detachment of right eye; and glaucoma with open angle of both eyes. (Admin. Tr. 12; Doc. 18-2, p. 13). The ALJ also identified the following medically determinable non-severe impairments: hypertension; morbid obesity; hyperlipidemia; dyslipidemia;

Page 9 of 26

gastroesophageal reflux disease (GERD); nephrolithiasis; dysuria; venous insufficiency; dermatitis; keratoconjunctivitis sicca; macular ischemia; cataract/nuclear sclerosis right eye; and allergic conjunctivitis. (Admin. Tr. 12-13; Doc. 18-2, pp. 13-14).

At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 13; Doc. 18-2, p. 14).

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in all ranges of work defined in 20 C.F.R. § 404.1567, but with the following non-exertional limitations:

> He can have frequent exposure to vibration. He must avoid all hazards such as moving machinery and unprotected heights. He cannot climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs. He must be able to turn his head right to l[eft] and up and down to assist in visual fields. If required to read, he must be able to magnify the material either with a computer or magnifying glass. He is able to work with larger objects, but cannot work with small items such as paper clips or coins.

(Admin. Tr. 13; Doc. 18-2, p. 14).

At step four, the ALJ found that, during the relevant period, Plaintiff could not engage in his past relevant work. (Admin. Tr. 15; Doc. 18-2, p. 16).

At step five, the ALJ found that, considering Plaintiff's age, education and work experience, Plaintiff could engage in other work that existed in the national economy. (Admin. Tr. 15-16; Doc. 18-2, pp. 16-17). To support her conclusion, the ALJ relied on testimony given by a vocational expert during Plaintiff's administrative hearing and cited the following three (3) representative occupations: hand packager, DOT #920.587-018; folder, DOT #369.687-014; and sorter, DOT #222.687-014. (Admin. Tr. 16; Doc. 18-2, p. 17).

**B.    WHETHER THE ALJ'S ASSESSMENT THAT PLAINTIFF CAN ENGAGE IN ALL RANGES OF WORK IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

One oft-contested issue in this setting relates to the claimant's residual capacity for work in the national economy. As discussed above, a claimant's RFC is defined as "the most [a claimant' can still do despite [his or her] limitations," taking into account all of a claimant's medically determinable impairments. 20 C.F.R. § 404.1545. In making this assessment, the ALJ is required to consider the combined effect of all medically determinable impairments, both severe and non-severe. 20 C.F.R. § 404.1545. Although such challenges most often arise in the context of challenges to the sufficiency of vocational expert testimony, the law is clear that an RFC assessment that fails to take all of a claimant's credibly established limitations into account is defective. *See Rutherford v. Barnhart*, 399

F.3d 546, 554 n. 8 (3d Cir. 2005) (noting that an argument that VE testimony cannot be relied upon where an ALJ failed to recognize credibly established limitations during an RFC assessment is best understood as a challenge to the RFC assessment itself); *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007) (noting that an ALJ must include in the RFC those limitations which he finds to be credible).

Moreover, because an ALJ's RFC assessment is an integral component of his or her findings at steps four and five of the sequential evaluation process, an erroneous or unsupported RFC assessment undermines the ALJ's conclusions at those steps and is generally a basis for remand.

In a function report, completed by Plaintiff on September 13, 2018 and submitted to the social security administration, Plaintiff reported that he was told not to lift more than ten pounds because lifting objects heavier than that could create higher pressure in the eye and cause his retina to detach, leaving him totally blind. (Admin. Tr. 156).

During his administrative hearing, Plaintiff testified that:

Q     Okay. And do you have a current drivers' license?

A     I do.

Q     And was it current back between June and December of 2017?

A      Yes

Q      And then, during that time frame, how often did you drive?

A      I would say locally, on a daily basis, locally.

Q      Any difficulties that you had at that time driving?

A      Yes.

Q      What problems did you have?

A      I did not do any night driving. I have, on the right side, I don't know what's the percentage, I would say a good 25 percent or 30 a dark area, and in low light conditions, that dark area becomes black, blinding. And also in the right quadrant of my vision, like, 4 or 5 o'clock, there's also a dark area, too, that becomes black in low light conditions.

. . . .

Q      And, so since June—which the amended onset date of June 2017, why do you feel that you couldn't return to any type of work since that time?

A      June of '17?

Q      Yes, June of 2017.

A      That's when I started to have my eye problems with the one eye that I could see decent with. Detached retina, doctor lasered— did laser surgery on my right eye, and basically said I shouldn't be doing anything; I shouldn't lift ten pounds, I shouldn't not go on any park rides, things like that, and so I was just taking it easy. And when those ice flashes came, they're the same ones that I had before, they never corrected.

Q      And how often do you get those?

A      every minute of every day, as far as the flashes go. And also a wavy, like, fluttering; like a wavy flag on the same part of my eye.

Q      And is that constant or does that come and go?

A      That's constant.

. . . .

Q      And did you have any problem walking during that time period?

A      Walking?

Q      Yeah.

A      No.

Q      Any problems did you have with standing?

A      Standing, no.

Q      Or sitting?

A      No.

Q      What type of things did you lift and carry during that period?

A      I mean, we were going back to 2017, I'd say very light things, under ten pounds, as requested by my doctor. Specifically I couldn't mention.

Q      And, I'm sorry, what doctor advised the under ten?

A      Dr. Lin, L-I-N.

Q      And when did he advise you of that?

A       Oh boy, quite a few times; the last time would have been in 2017, June or July when he did my laser surgery. He also recommended that I avoid stress at the time, too.

ALJ: Counsel, do you have any questions?

Atty: I think just briefly, judge.

Q       So, David, we knew what the Doctor said about the vision that you have, but tell us if it's—in your own words, how do you see, what do you see when you look through your eyes and look around?

A       Well, right now, if I can describe it, the inside of my eye, I see, like a mo[o]n shape going this way. If I run my finger through, it's like running through a dark shadow, so like at this point right there.

Q       And that's on your right eye?

A       My right eye.

Q       And so, left eye, any vision at all? Is there light, hand movements, you tell me?

A       In my left eye, only on the peripheral, I can see, like, a shadow. I can't like, count fingers, I would just see a shadow of my hand moving, and that's only on the peripheral—

. . . .

Q       . . . , Dr. Lin, is Dr. Lin still your doctor or has Dr. Lin moved on?

A       Dr. Lin is still with Progressive, but what happens is, when I had another eye detachment in December of 2018, I ended up with over 20 tears in my same eye that he lasered, and Dr. Lin was out of the county, so they send me down to their ither retinal specialist, Dr. Jonathan Hu, who works with the same

Page 15 of 26

company, Progressive Vision Institute, and he did my surgery for me—

Q    Did you understand what—why are you not supposed to lift very heavy and avoid things like rides and vibrations?

A    For future retinal detachments; to prevent—

Q    How many have you had?

A    In which eye?

Q    In both, so start with the left.

A    one, two, three, four. Four, I think retinal detachments in my left eye—

Q    And your right—

A    --right now, my left eye, they left a silicone oil in my eye so it can't detach, but that also ruined my optical nerve, which caused my blindness.

Q    What about the right eye?

A    My right eye, I had five surgeries; that includes three laser surgeries and two surgeries in the O.R. in my right eye.

Q    Looking at me right now, I can see that both eyes are very bloodshot, right eye is very bloodshot, is that how it normally looks?

A    Yes. It's—they're bloodshot every day.

. . . .

Q    So prior to the revision that was needed in September of 2018—

A      I'm sorry, the revision was done last month, I had surgery last month again.

Q      Okay.

A      That was the revision.

Q      Okay, March 2019. Okay.

A      April 3rd, 2018 was the revision surgery date.

Q      Okay, April 3rd, yeah. Sorry. SO, was the first surgery—I want to make sure—the first surgery, then was in September 2008 on the right eye? Or was that also a second surgery?

A      The first surgery was laser surgery by Dr. Lin in 2017

Q      Okay.

A      July. I think it was July.

Q      And the retinal—

A      He kept me coming back month after month for him to, because he was so concerned about it, he wanted to see me constantly, once a month. And it just so happens that I have a bunch of multiple tears, he was out of town at that time.

Q      And when you're talking about those tears, those are the ones that they fixed in September of 2018?

A      Correct.

Q      With the buckle surgery?

A      Correct. And after they cure what I still have today, so he did a revision last month, and that still didn't help the situation.

(Admin. Tr. 59-70).

Treatment records that post-date the relevant period suggest that Plaintiff should not engage in "heavy" lifting. (Admin. Tr. 443) (recommending "no heavy lifting" on  September 5, 2018); (Admin. Tr. 1006) (recommending "no heavy lifting" on April 4, 2019); (Admin. Tr. 1002) (recommending "no heavy lifting" on April 10, 2019). These records, however, do not explain what is meant by "heavy." The Court cannot assume that the source is familiar with the Commissioner's definition of that term.

In her decision, the ALJ summarized Plaintiff's testimony and the objective medical evidence as follows:

> When he first applied for disability benefits, the claimant alleged being blind in both eyes, having torn retinas in both eyes, and having diabetes, high cholesterol, and high blood pression (Ex. 1E). In a Function Report, he alleged having difficulty lifting, squatting, bending, seeing, completing tasks, and concentrating (Ex. 3E). At the hearing, he testified that he is unable to work due to visual limitations. He stated that he uses a laptop to email but that he needs to use a magnifying glass to read a newspaper. He stated that he can no longer hunt or ride snowmobiles, but admitted to having no problems sitting, standing, or walking. He stated that he has constant pain in his eyes and can see only shadows with his left eye.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

> The claimant has a history of left eye glaucoma, detached retina, pseudophakis, and right eye cataract (Ex. 6F). As of the amended alleged onset date, his vision was measured as 20/20 in the right eye, but hand motion only in the left eye (Ex. 6F). He reported flashing lights in his left eye, describing it as intermittent and moderate in severity (Ex 6F). Between the amended alleged onset date and the date last insured, he complained of "fluttering vision" in his right eye, occasional flashing in his right eye, wavy vision, floaters in the right eye, and episodic sharp pain lasting for seconds in the left eye (Ex. 6F). His overall condition severity was described as mild, however (Ex. 6F). Vision in his left eye remained hand motion only during this period, and vision in his right eye was reduced from 20/20 on the amended alleged onset date to 20/30 when evaluated on December 18, 2017 (Ex. 6F). While his vision continued to decline in 2018, his limitations as of the date last insured appear to have been mild.

(Admin. Tr. 14). This summary does not discuss Plaintiff's testimony about his capacity to lift objects or any mention of a lifting restriction from the treatment notes.

Regarding the ALJ's evaluation of Plaintiff's lifting limitations, Plaintiff argues:

> Plaintiff was an individual closely approaching advanced age as of the alleged onset disability date. (TR p. 15) He meets the insured status requirements of the Social Security Act through December 31, 2017. Plaintiff testified at a hearing held before the ALJ on May 23, 2019. He testified that his vision worsened in June 2017. He started having worse problems with his right eye. Of note, he is status post multiple retina repair surgeries in his left eye. (Exhibit 11F. TR p. 788) In the left eye, Plaintiff's vision is limited to 20/hand motion. (TR pp 791, 801, 811) Then in June 2017 the vision in his right/good eye worsened and he began having constant flashes and wavy fluttering. (TR. p. 60) The doctor who performed the surgery told Plaintiff he should not lift ten pounds. (TR p 60) Plaintiff does not perform chores and must read

with a magnifying glass. He has limited his activities for approximately ten years because the retina specialist told him that he had a 90% chance of retinal detachment in the right eye. Plaintiff was told this after he essentially went blind in his left eye. (TR p 62) Plaintiff again confirmed he only lifts under ten pounds as requested by his doctor. (TR p 63)

Plaintiff's testimony in regard to lifting limitations finds support in the medical records. (Exhibit 12F) The doctor specifically indicates Plaintiff was to "continue to refrain from heavy lifting". (Exhibit 12F, TR p 1,002) While this Note is drafted after Plaintiff's date last insured, the lifting restriction was clearly in place prior to this office visit. Plaintiff's testimony is also supported by the medical record. He was examined by his retina specialist on June 8, 2017. He reported flashing lights and had macular ischemia. (TR p 830) As of July 10, 2017 he reported fluttering vision and on July 20, 2017 he was diagnosed with a temporal tear on the right. (TR p 814) He was noted to have floaters and flashes. (TR p 811) His vision in his left eye was 20/hand motion. (TR p 811)

On August 18 Plaintiff was noted to have wavy vision, flashes of light, floaters and Plaintiff's vision was worse. He was diagnosed with a macular hole. The vision in the left was 20/hand motion. (TR p 801) Approximately two months later on October 20, 2017 he was noted to have black spots in the right eye, floaters, flashes and fluttering vision. (TR pp 791, 798) On December 18, 2017 his vision (both eyes) was abnormal. (TR p 783) He was noted to be status post retinal repair, times three, in the left eye. (TR p 788) The doctor noted post ditreous detachment with flashing lights in both eyes. (TR p 788) He was again noted to have a macular hole in the right. (TR p 788)

Despite Plaintiff's testimony and supportive medical records the ALJ assigned an unrestricted exertional RFC. This is inconsistent with the testimony, which was supported by medical records and medical diagnoses. The ALJ summarized medical records supporting the RFC in less than two pages. In summary the ALJ indicated the residual functional capacity assessment is supported by the totality of the evidence. The ALJ went on to indicate that Plaintiff has very limited

vision in his left eye from before the amended onset date, but noted his right eye was "fairly intact through the date last insured". (TR p 15) The ALJ then acknowledged his right eye has apparently significantly worsened more recently. (Id.) The RFC finding is against the weight of the evidence and not based on substantial evidence of record. In fact the evidence establishes Plaintiff is 20/hand motion in his left eye. Plaintiff's vision in his right eye is abnormal. (TR p 783) He is post vitreous detachment with flashing in both eyes. (TR p 788) There is a macular hole in the right eye. (TR p 788) He has flashes, floaters and fluttering vision in the right eye. (TR pp 791, 798) He had a temporal tear in the right. (TR p 814) He also had macular ischemia. (TR p 830) The doctor told him to continue to refrain from heavy lifting. (Exhibit 12F, TR p 1,002) According to Plaintiff, the doctor had told him to refrain from heavy lifting years ago when he had a 90% chance of detachment in his good eye. (TR p 62) Specifically, Plaintiff was told he should not lift even ten pounds. (TR p 60)

Because the ALJ, in error, assigned an unrestricted exertional RFC, she did not even consider the Medical Vocational Rulings. Of note, if the ALJ appropriately credited Plaintiff's testimony as to his lifting limitation, the Medical Vocational Rules would have directed a finding of disability. In light of the above it does not appear the ALJ's Decision and RFC determination was based on such relevant evidence as a reasonable mind might accept as adequate to support the conclusions. Further it does not appear the ALJ's RFC was based upon a review of the entire record including the objective medical evidence, opinion evidence and Claimant's testimony per 20 C.F.R. 404.1545(a). In fact, when discussing Plaintiff's testimony the ALJ failed to even address Plaintiff's lifting limitation of less than ten pounds. (TR p 14) She summarized Plaintiff's entire testimony as follows: "At the hearing, he testified that he is unable to work due to visual limitations. He stated that he uses a laptop for email but that he needs to use a magnifying glass to read a newspaper. He stated that he can no longer hunt or ride on snowmobiles, but admitted to having no problems sitting, standing, or walking. He stated that he has constant pain in his eyes and can see only shadows with the left eye". (TR p 14) This is so despite the fact Plaintiff testified he was told by his specialist he should not lift ten pounds. (TR p 60) He told the ALJ he

has limited his activities for ten years when his retina specialist told him he has a 90% chance of detachment in his good eye. (TR p 62) On one additional occasion Plaintiff said he keep his lifting to under ten pounds as requested by his doctor. (TR p 63) The testimony again finds support at Exhibit 12F (TR p 1,002) where the doctor indicates Plaintiff was to <u>continue</u> to refrain from heavy lifting. Despite this the ALJ failed to even address the lifting limitations when she discussed Plaintiff's testimony. In light of the above it does not appear that the ALJ's Decision and RFC are based on substantial evidence of record.

(Doc. 21, pp. 3-6).

In response, the Commissioner argues:

Plaintiff argues that the ALJ did not consider a lifting restriction in the residual functional capacity assessment (Pl.'s Br. At 3). Specifically, Plaintiff argues that the ALJ should have given credit to Plaintiff's testimony that he was restricted to lifting no more than ten Pound (Pl.'s Br. At 3). This argument is without merit. Nowhere in the medical record is there any evidence that any of Plaintiff's physicians restricted him to lifting no more than ten pounds.

Plaintiff also makes much of the fact that, in April 2019, more than one year after his insured status expired, Plaintiff's physician commented, "[n]o positioning restrictions. [Continue] to refrain from heavy lifting" (Pl.'s Br. At 6; Tr. 1002). This comment does not advance Plaintiff's claim for several reasons.

First, as just mentioned, this comment was made well after Plaintiff's insured status expired and, therefore, does not address Plaintiff's ability to lift during the relevant period (i.e., June 2017 through December 2017).

Second, this comment does not even amount to a medical opinion as defined in the Commissioner's regulations. Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. Effective for claims filed on or after March 27, 2017, the agency has comprehensively revised its regulations that govern

Page 22 of 26

medical opinions, creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (Mr. 27, 2017)). The new regulations more specifically define "medical opinion" and wholly eliminate what has been referred to as the "treating source rule." *Id.*; 20 C.F.R. § 404.1513(a)(2) (2017) (defining "medical opinion"); 20 C.F.R. § 404.1520c (2017) (explaining how an adjudicator considers and articulates his or her consideration of medical opinions).

For claims filed on or after March 27, 2017, the agency has more clearly defined what constitutes a "medical *opinion*," as distinguished from other forms of medical evidence. While the prior definition was somewhat broad, the agency's adjudicative experience showed "that a narrower definition of medical opinions would improve our adjudicative process." Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed. Reg. 62530-01, 62562 (Sept. 9, 2016). The new regulations define medical opinions as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental or other demands of work activities or adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2017). In any event, as previously discussed, this comment, made well after Plaintiff's insured status expired, is irrelevant as to Plaintiff's lifting ability during the relevant period.

Third, this comment is not the ringing endorsement of disability during the relevant period that Plaintiff claims it to be. In April 2019, more than one year after Plaintiff's insured status expired, his physician stated only that he should not perform heavy lifting (Tr. 1002). However, two of the representative occupations identified by the vocational expert are performed at only the light exertional level (Tr. 73). That ALJ amply accounted for Plaintiff's work-related complaints that were supported by the record, and the decision should be affirmed.

(Doc. 22, pp. 9-12).

In this case, Plaintiff alleged before, and during, the administrative hearing that he was unable to lift more then ten pounds. Plaintiff explained that his doctor told him that lifting more than ten pounds could result in further damage to his vision, and that he was at risk for retinal detachment in one or both eyes. The ALJ rejected this limitation without explanation.

In *Cotter v. Harris*, the Third Circuit recognized that there is "a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." 642 F.2d 700, 706 (3d Cir. 1981). In defining the parameters of this obligation, the Circuit explained:

> [i]n our view and examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.

*Id.* at 705 (quoting *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)). In its opinion denying a rehearing in *Cotter*, the Circuit further elaborated that "in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481 (3d Cir. 1981).

Page 24 of 26

In her response, the Commissioner cites to multiple reasons why Plaintiff's allegations about his inability to lift more than ten pounds *could* have been discredited. However, these reasons were not cited by the ALJ. "[I]t is well-established that '[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision;' the Commissioner may not offer a post-hoc rationalization." *Keiderling v. Astrue*, No. 07-2237, 2008 WL 2120154 at *3 (E.D. Pa. May 20, 2008) (quoting *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)). The ALJ in this case did not address the lifting limitation at all. The absence of an explanation for the rejection of the lifting limitation is an error.

The Commissioner also argues that the failure to explain why the lifting limitation was rejected is harmless because two of the occupations identified by the VE and cited by the ALJ are "light" work—which would require Plaintiff to lift up to twenty pounds. 20 C.F.R.§ 404.1567(b) (defining light work). I note, however, that only one of the occupations cited by the ALJ—sorter, DOT #222.687-014—is classified as "light" work. The occupation of "folder," identified by the VE and cited by the ALJ as DOT #369.687-014 corresponds to the occupation of "checker" which is classified as "medium" work. 1991 WL 673071. Furthermore, "light" work exceeds the lifting limitation at issue. Thus, if the ten pound lifting limitation

was credited in this case, the outcome may be different. Therefore, I am not persuaded that this error is harmless.

## V.      CONCLUSION

Accordingly, I find that Plaintiff's request for relief will be GRANTED as follows:

(1)     The final decision of the Commissioner will be VACATED.

(2)     This case will be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further development of the record and to issue a new decision.

(3)     Final judgment will be issued in favor of David Whiteash.

(4)     An appropriate order will be issued.


Date: March 11, 2022                    BY THE COURT

                                        *s/William I. Arbuckle*
                                        William I. Arbuckle
                                        U.S. Magistrate Judge